IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ANGELA GARRETT,

     Plaintiff,

-vs-                              CASE NO. 8:16-cv-2999-VMC-AAS

CREDIT PROTECTION
ASSOCIATION, L.P.,

     Defendant.
_____/


DEPOSITION OF:      ANGELA GARRETT

DATE TAKEN:         Friday, February 17, 2017

TIME:               1:02 p.m. to 2:17 p.m.

PLACE:              Law Office of Michael A. Ziegler
                    13575 58th Street North
                    Suite 129
                    Clearwater, Florida

REPORTED BY:        Beverly Replogle, RPR
                    Notary Public

9e4239cd-b653-466a-8652-401f62ad8661

Page 2

```
 1   APPEARANCES:

 2   KAELYN STEINKRAUS, ESQUIRE
          Law Office of Michael A. Ziegler, P.L.
 3        13575 58th Street North
          Suite 129
 4        Clearwater, Florida 33760
          727-538-4188
 5        Kaelyn@zieglerlawoffice.com

 6            Appearing on behalf of the Plaintiff

 7
     RUEL W. SMITH, ESQUIRE
 8        Hinshaw & Culbertson, LLP
          100 South Ashley Drive, Suite 500
 9        Tampa, Florida 33602
          813-276-1662
10        rsmith@hinshawlaw.com

11            Appearing on behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       I N D E X

2   TESTIMONY OF ANGELA GARRETT:                    PAGE

3        Direct Examination By Mr. Smith.............  4

4   CERTIFICATE OF REPORTER.......................... 72

5   CERTIFICATE OF OATH.............................. 73

6   ERRATA SHEET.................................... 74

7   LETTER TO ATTORNEY.............................. 75

8                        - - - - -

9

                      E X H I B I T S
10
                                                PAGE
11
     Exhibit Number 1
12        Copy of Ms. Garrett's Driver's
          License....................................  6
13
     Exhibit Number 2
14        Bright House Networks Work
          Order/Receipt............................. 32
15
     Exhibit Number 3
16        Affidavit of Plaintiff Angela Garrett........ 60

17   Exhibit Number 4
          PrivacyStar log and slip sheet.............. 64
18
     Exhibit Number 5
19        Plaintiff's Verified Responses to the
          Court's Interrogatories to Plaintiff......... 65
20

21

22

23

24

25

9e4239cd-b653-466a-8652-401f62ad8661

1          THE COURT REPORTER:  Raise your right hand,
2      please.  Do you swear or affirm that the
3      testimony you are about to give in this cause
4      will be the truth, the whole truth, and nothing
5      but the truth?
6          THE WITNESS:  Yes.
7                    ANGELA GARRETT,
8  having been first duly sworn, was examined and testified
9  upon her oath as follows:
10                   DIRECT EXAMINATION
11  BY MR. SMITH:
12     Q    Good afternoon, Ms. Garrett.
13     A    Good afternoon.
14     Q    My name is Ruel Smith.  I'm the attorney
15  representing Credit Protection Association in this
16  lawsuit.
17          We're here today for your deposition.  I guess
18  as a preliminary question:  Have you ever had a
19  deposition taken before?
20     A    No, I have not.
21     Q    All right.  Let's go over the ground rules.
22  I'll be asking questions.  You'll be answering them
23  truthfully and accurately to the best of your ability.
24  Madam Court Reporter is going to take down everything we
25  say, and what that means is she's really only able to

1    take down what one person says at a time.  So it's a very

2    natural tendency for people to kind of anticipate the

3    answer to a question and go ahead and start giving the

4    answer.  You don't want to do that in this situation

5    because she will have a hard time if you're speaking and

6    I'm speaking.

7           Along those same lines, she isn't able easily to

8    interpret a nonverbal gesture, like a shrug or a shake of

9    the head or a nod of the head, so --

10      A    Make sure I --

11      Q    Right.  There may be times where you hear me

12   sort of prompt you after giving that sort of response,

13   and I'm not doing it to be rude or cute or anything like

14   that.  I'm doing it to ensure that there's a clean

15   record.  So if you were to shrug or nod or something like

16   that and I were to say, "Is that a yes or is that a no,"

17   it's so that there's a more properly recorded response on

18   the record.

19      A    Sure.

20      Q    If you don't understand the question, ask me to

21   rephrase it.

22           If you don't hear the question fully, ask me to

23   repeat it, and I will.  If you don't ask for that

24   clarification, the record will reflect that you

25   understood and heard the question.  So ask me if you need

9e4239cd-b653-466a-8652-401f62ad8661

1   something repeated or rephrased.

2          If we take -- it's not intended to be marathon,

3   but it could be long enough that you want to take a

4   comfort break.  If you do, just ask.  The only thing I

5   would ask is that if I've posed a question and it hasn't

6   been answered yet, that we get the answer before the

7   break.

8      A    Sure.

9      Q    So now preliminarily, if you would, state and

10  spell your full name for the record?

11     A    Angela, A-n-g-e-l-a.

12     Q    Okay.  And your last name?

13     A    Garrett, G-a-r-r-e-t-t.

14     Q    Ms. Garrett, did your bring your driver's

15  license with you by any chance?

16     A    Yes, I have.

17     Q    Can you provide that to me and with -- what the

18  idea here is is that will be Exhibit 1 to your

19  deposition.

20          (Exhibit Number 1 identified.)

21  BY MR. SMITH:

22     Q    The reason that's done is so that I have proof

23  that this person with this ID showed up for the

24  deposition if there's ever a question about who it was

25  that came here and answered these questions.

9e4239cd-b653-466a-8652-401f62ad8661

1       A     Sure.

2       Q     And I think what we'll do is if we do take a

3    break, that's when I'll ask Madam Court Reporter to make

4    a copy of it.

5       A     Okay.

6             MR. SMITH:  I take it this is all for us?

7             MS. STEINKRAUS:  Yes.

8    BY MR. SMITH:

9       Q     And now I'm going to ask you a question off the

10   record, and that is if you would please provide me your

11   social security number.

12            (There was an off-the-record discussion.)

13   BY MR. SMITH:

14      Q     All right.  Back on the record.

15            Is there anything affecting you today that would

16   prevent you from truthfully and accurately answering the

17   questions that are put to you?

18      A     No.

19      Q     Okay.  And specifically, let me ask a couple of

20   things.  Are you feeling okay?  Are you suffering from

21   any kind of illness?

22      A     Can you clarify that?

23      Q     Well, is -- for example, sometimes people come

24   in and they have a terrible case of the flu, and that

25   might not be the best day for them to provide testimony.

Page 8

1    Is there anything like that bothering you today?

2        A    No.

3        Q    Okay.  Are you on the -- are you on any

4    prescription medications that affect memory or perception

5    or anything like that?

6        A    No.

7        Q    Okay.  Have you had any alcohol to drink in the

8    last 12 hours?

9        A    No.

10       Q    All right.  Is there anything else you can think

11   of that would impact your ability to accurately and

12   truthfully answer questions today?

13       A    No.

14       Q    Wonderful.  Ms. Garrett, where do you live?

15       A    I live at 2614 Shilo Court in Valrico, Florida.

16       Q    Okay.  How long have you lived at 2614 Shilo

17   Court in Valrico?

18       A    Three and a half years.

19       Q    So we're looking at 2013 you would have moved in

20   there?

21       A    It was 2014.

22       Q    Okay.  Does anyone live there with you?

23       A    Yes.

24       Q    Who lives in -- who lives with you at 2614 Shilo

25   Court, Valrico?

1     A    My husband and my son.

2     Q    Okay.  And what is your husband's name?

3     A    Robert Christian Garrett.

4     Q    Okay.  And has he lived with you at all times

5    that you've lived there for the past three and a half

6    years?

7     A    Yes, he has.

8     Q    And your son is Garrett?

9     A    Robert Tyler Garrett.

10     Q    Robert Tyler Garrett.  I'm sorry.

11          And has he lived with you at all of the times

12    you've lived at 2614 Shilo Court?

13     A    Yes, he has.

14     Q    Is that where you receive your mail?

15     A    Yes.

16     Q    No P.O. Box or anything like that?

17     A    No, sir.

18     Q    Where did you live before that?

19     A    I lived at 6010 North Cameron Avenue in Tampa.

20     Q    And how long were you there?

21     A    I was there for approximately two or three

22    years.

23     Q    All right.  Before 6010 North Cameron in Tampa,

24    where were you?

25     A    I was living off of -- I was in a trailer,

1    Riverside Drive.  I can't exactly remember.

2        Q    And what town?

3        A    It was in Tampa.

4        Q    Okay.  About how long were you there?

5        A    I was only there for maybe a year.

6        Q    Okay.  Have you lived anywhere outside the Tampa

7    Bay area?

8        A    Yes, I have.

9        Q    Where were you outside the Tampa Bay area?

10       A    I've lived in Titusville for most of my life --

11       Q    Okay.

12       A    -- and we did spend some time in Indian Harbour

13   Beach.

14       Q    Okay.  What years were you in Titusville?

15       A    When the Challenger blew up.

16       Q    In 1986?

17       A    So we moved there in 1986 right after the

18   Challenger blew up, and I graduated high school from

19   there as well.

20       Q    All right.  And when did you graduate high

21   school?

22       A    1999.

23       Q    All right.  And then was the -- what was the

24   name of the other location that you lived in for a period

25   of time?

Page 11

1      A     I'm sorry?

2      Q     You said you -- you said that you lived in

3   Titusville?

4      A     Yes.

5      Q     And there was one other place outside the Tampa

6   Bay area?

7      A     That was Indian Harbour Beach.

8      Q     Indian Harbour Beach?  Help me out.  Where is

9   that?

10     A     That's on the East Coast of Florida.  It's on

11  A1A.

12     Q     Okay.  And is that where you lived after leaving

13  Titusville but before coming to Tampa Bay?

14     A     Before Titusville and before coming to Tampa

15  Bay.

16     Q     So that was very, very young?

17     A     Yes.

18     Q     You're a small child at that point?

19     A     Yes.

20     Q     Would you give me the benefit of your education,

21  please?

22     A     I graduated with honors from high school.

23     Q     Uh-huh.

24     A     I then went on to Florida State on scholarship.

25     Q     Go Seminoles.  Sorry.  I'm a Florida State

Page 12

1    graduate as well.

2              Okay.  You went to FSU on scholarship?

3    A     Yes.

4    Q     And did you attain a degree from Florida State?

5    A     I was unable to.  I had to medically withdraw.

6    Q     Okay.  When were you at Florida State?

7    A     1999 through 2000.

8    Q     Okay.  What was the reason for the medical

9    withdrawal?

10   A     For the medical withdrawal?

11   Q     Yes, ma'am?

12   A     I was having extreme female issues.

13   Q     Okay.  Did you go back to school anywhere else?

14   A     I did start attending back at Brevard Community

15   College when I moved back home.

16   Q     Did you complete a degree at Brevard?

17   A     No, I did not.

18   Q     Do you have any trade schools?

19   A     No, I do not.

20   Q     Do you have any professional licenses?

21   A     No, I do not.

22   Q     Okay.  Any special certifications?

23   A     No.

24   Q     All right.  Are you currently employed?

25   A     Yes.

9e4239cd-b653-466a-8652-401f62ad8661

Page 13

1       Q    Where do you work?

2       A    Citigroup Technology.

3       Q    And where is Citigroup Technology located?

4       A    It's located in Tampa.  We have several

5   campuses.

6       Q    Which one do you work at?

7       A    The Hidden River campus in River Parkway.

8       Q    Is that on River Parkway or --

9       A    Hidden River Parkway.

10       Q    Hidden River Parkway?

11            Okay.  And how long have you worked there?

12       A    I've worked there for two years.

13       Q    So since 2015 or sometime in 2014?

14       A    The beginning of 2015.

15       Q    Okay.  Where were you before that?

16       A    I was at Clarifire in St. Petersburg.

17       Q    Clarifire?

18       A    Yes.

19       Q    Is that the name of a company or the name of a

20   job title?

21       A    The company.  It was E. Mason, doing business as

22   Clarifire.

23       Q    And that was in Clearwater?

24       A    That was in St. Petersburg.

25       Q    Or St. Pete.  Okay.

Page 14

1          How long were you there?

2     A    I was there for a little over two years.

3     Q    All right.  So in 2014 and 2015 you -- in 2014

4  you were working at E. Mason, doing business as

5  Clarifire.  In 2015, you were at Citigroup Technologies

6  in Tampa?

7     A    Correct.

8     Q    Where -- what's the location of the Clarifire

9  office or facility that you would have worked at for

10 them?

11    A    118th Street, St. Petersburg -- or 118th Court.

12 I can't exactly remember, but it's --

13    Q    I get the general sense.

14    A    Yes.

15    Q    What types of work did you do, I guess, starting

16 with Clarifire?

17    A    Clarifire is a software-development company --

18    Q    Uh-huh.

19    A    -- handling loss-mitigation for foreclosure.

20    Q    So that's what they do.  What did you do for

21 them?

22    A    I was a product specialist, subject-matter

23 expert on the -- it was a product called The Calculator,

24 and we developed it for the mortgage companies to utilize

25 to determine if they could do a workout.

1      Q     Okay.  So when you say you were a product -- a

2   subject-matter expert or product specialist concerning

3   the software Calculator, would that mean kind of how it

4   was created, or would that mean what it did and what it

5   was capable of for the -- for the user?

6      A     Both.

7      Q     Okay.

8      A     I actually helped working with developers,

9   adding code in, fixing things, and intensively testing

10   The Calculator to make sure it worked properly.

11      Q     So you have a significant amount of technology

12   skill.  Is that fair to say?

13      A     Yes, sir.

14      Q     Okay.  And what did you do -- or do you do for

15   Citigroup Tech?

16      A     I am an assistant vice president of regulatory

17   reporting and a requirements analyst.

18      Q     Can you tell me what you do as an AVP of

19   regulatory reporting?

20      A     As an AVP of regulatory report, I'm responsible

21   for receiving the data plans from the developers, the

22   regulations from the regulatory, and set up a --

23   basically manage the project to ensure that all of the

24   code is incorporated correctly and that everything is

25   according to the regulations.

9e4239cd-b653-466a-8652-401f62ad8661

Page 16

1      Q     What kind of regulations govern that?

2      A     The regulatory regulations for the Fed.

3      Q     When you say "the Fed," you mean the Federal

4   Treasury or the FDIC or --

5      A     Both.

6      Q     Okay.  So regulatory requirements concerning

7   financial --

8      A     Correct.

9      Q     -- entities?

10     A     Correct.

11     Q     Okay.  All right.  When you were with Clarifire

12  or E. Mason, doing business as Clarifire, did you --

13  let's see -- St. Petersburg.  Were you living at that

14  time at the Shilo Way address?

15     A     Shilo Court address.

16     Q     Shilo Court.  Okay.

17     A     Yes, sir.

18     Q     Oh.  Was that a commute for you?

19     A     Yes, it was, and that's part of the reason I

20  left.

21     Q     Okay.  So did you take the Franklin Bridge or

22  the Courtney Campbell or the Gandy?

23     A     I took the Crosstown, 275, Gandy.  I did use all

24  of those.

25     Q     Okay.  And how is your commute now at Citigroup

Page 17

1   Tech?

2       A    The distance is a lot shorter.  It's a lot

3   closer to my home, and I'm able to work from home.

4       Q    Got it.  How long would you say it took you to

5   get to work back when you were with E. Mason?

6       A    E. Mason?

7       Q    Um-hmm.

8       A    It took me over an hour.

9       Q    Both ways?

10      A    Oh, no.  Both ways?  It was actually two and a

11  half hours.

12      Q    Okay.  You spent two and a half hours in the car

13  to get to work?

14      A    Correct.

15      Q    And now it's much shorter?

16      A    Correct.

17      Q    How long would you say it is now?

18      A    It takes me maybe 30 minutes to get there and

19  maybe 45 minutes to an hour to get back, depending on

20  traffic.

21      Q    Okay.  Do you use your cellphone in the car?

22      A    On hands-free.

23      Q    Okay.  What kind of car do you drive?

24      A    I drive a Sonata.

25      Q    What year Sonata?

Page 18

1       A       2013.

2       Q       How long have you had the 2013 Sonata?

3       A       2013?  About five years.

4       Q       All right.  Do you ever work from home?

5       A       I do work from home.

6       Q       Okay.  Does that involve some of that coding

7    integration of regulatory requirements?

8       A       Yes, it does.

9       Q       Okay.  So you potentially have to access the

10   systems of Citigroup Tech from the home?

11      A       Correct.

12      Q       Was that also true at E. Mason?  Did you work

13   from home there?

14      A       I could work from home from there as well, and I

15   did a few times when I was sick.

16      Q       Okay.  And I take it you say you're capable of

17   doing it, because your company has a Web-based way to

18   access like a Citrix Platform or something like that?

19      A       Yes.

20      Q       And did that exist at both companies?

21      A       Yes, it did.

22      Q       All right.  I want to talk a minute about your

23   cellphone company.

24      A       Yes.

25      Q       You're a member of U.S. Sprint?

9e4239cd-b653-466a-8652-401f62ad8661

Page 19

1    A    Yes, I am.

2    Q    All right.  And the present cellphone number is

3    727-452-4687?

4    A    That's correct.

5    Q    How long have you had that number?

6    A    I've been with Sprint for 16 years, so I'd say

7    16 years.

8    Q    Hopefully they appreciate it.

9         Has that number always been a cell, or was it

10   ported over from a home number?

11   A    No, that's always been a cellphone.

12   Q    All right.  And what kind of phone do you

13   presently use?

14   A    I have a Samsung Galaxy S7 Edge.

15   Q    Nice.  That sounds pretty up to date?

16   A    Yes.

17   Q    When did you get the S7 edge?

18   A    That was over a -- a little over a year ago.

19   Q    So that's a phone you've only had in 2016 and

20   2017?

21   A    Correct.

22   Q    What phone did you have before that?

23   A    I had a Samsung Galaxy S6.

24   Q    You're a loyal Samsung customer.

25   A    Yes, I am.

Page 20

1      Q      How long did you have the S6?

2      A      The S6 I did have for approximately three years.

3      Q      So you would have had the Samsung S6 in the

4    years 2015, 2014, and maybe 2013?

5      A      Correct.

6      Q      All right.  Do you still have the S6?

7      A      No, I do not.

8      Q      Did you trade it in to get the S7?

9      A      Yes, I did.

10     Q      Was there a -- was there a process by which data

11   was transferred from the S6 to the S7 when you got the

12   S7?

13     A      Yes.  It was just a transfer through Google.

14     Q      Okay.  So did you perform that yourself, or did

15   they do it at Sprint?

16     A      They did it at Sprint.

17     Q      Do you know what Sprint store you obtained the

18   S7 at?

19     A      It was one of those Sprint kiosks in the mall.

20     Q      Got it.  Do you know which mall?

21     A      Brandon Town Center.

22     Q      How about Robert?  Does he use a -- by "Robert,"

23   I mean Robert C. Garrett.  Does he use a cellphone?

24     A      Yes, he does.

25     Q      Is it also a Sprint cellphone?

Page 21

1     A     It is.

2     Q     Are you guys on a family plan?

3     A     We are.

4     Q     Okay.  Robert T. Garrett -- did I get the

5  initial right?

6     A     Correct.

7     Q     Okay.  Robert T. Garrett, does he use a

8  cellphone?

9     A     Yes, he does.

10    Q     Is he on the same family plan?

11    A     Yes, he is.

12    Q     Have they -- has it always -- I assume that your

13 son hasn't been part of your family plan for 16 years?

14    A     Correct.

15    Q     Do you know about when you-all three were part

16 of the same family plan, when that began?

17    A     In the last year.

18    Q     All right.  Had you and your husband been on a

19 plan that was family or bundled or joint before last year

20 when your son was added?

21    A     Yes.

22    Q     Okay.

23    A     We've always been on a family plan.

24    Q     So all the way back to 2001, 16 years ago,

25 roughly?

9e4239cd-b653-466a-8652-401f62ad8661

Page 22

1      A     Yes.

2      Q     All right.  Does he also have a (727) phone

3   number?

4      A     No, he does not.

5      Q     What phone number does he have?

6      A     321-917 --

7      Q     Um-hmm.

8      A     -- 7091.

9      Q     Okay.  And is that a Brevard County?

10     A     Yes, it is.

11     Q     Did you meet your husband in Brevard County?

12     A     No, I did not.

13     Q     Okay.  Where did you meet?  Where did you two

14   meet?

15     A     Tallahassee.

16     Q     At Florida State?

17     A     Yeah.

18     Q     Okay.  Is he from Brevard County?

19     A     No, he's not.

20     Q     Any idea why he's got a Brevard County phone

21   number?

22     A     Because we actually lived in Brevard County for

23   some time.

24     Q     So there came a time after Tallahassee where you

25   went back to Brevard County?

9e4239cd-b653-466a-8652-401f62ad8661

1      A      Correct.

2      Q      Okay.

3      A      When I medically withdrew, I then went back home

4   to Brevard County.

5      Q      And he came with you?

6      A      Correct.

7      Q      Whose name is on the family plan --

8      A      Mine.

9      Q      -- presently?  Yours?

10          So in other words, Robert C. Garrett uses a

11   phone that is part of a family plan that is in your name?

12      A      Correct.

13      Q      And has that been the case for as long as you've

14   had a family plan with him?

15      A      Yes.

16      Q      Who pays the phone bill?

17      A      I do.

18      Q      All right.  What does Robert do for a living?

19      A      He is a supervisor model technician, dental.

20      Q      Supervisor model technician?

21      A      Uh-huh.

22      Q      What -- what does a dental -- what does a

23   supervisor model technician dental do?

24      A      When you go to the dentist and you have to have

25   a crown, bridge, anything of that sort made --

Page 24

1      Q     Uh-huh.

2      A     -- you take -- the doctor takes that impression

3   of your mouth.

4      Q     Uh-huh.

5      A     Sends it into the lab.  My husband then receives

6   it, and he makes the 3D model of your mouth.

7      Q     How cool.

8            So I take it he's a technologically savvy person

9   as well?

10     A     He's more hands -- no, he's more hands-on.

11     Q     Okay.

12     A     I'm pretty much the tech person.

13     Q     You're the tech person?

14           All right.  How long has he had that job?

15     A     Almost five years.

16     Q     Sure.  Your cellphone, the number 727-452-4687,

17   we talked about the S7 that you've used with that number

18   for the past year or so?

19     A     Sure.

20     Q     And then we talked about the S6 that came before

21   it.  Has it been moved over to any other phone during

22   those periods -- during the last four years?

23     A     No.

24     Q     Okay.  Is there anyone else that uses your

25   phone?

Page 25

1       A    No.

2       Q    All right.  Does Robert C. ever use it to make

3   calls from time to time?

4       A    No, he does not.

5       Q    Does he ever receive calls on it?

6       A    Yes, he does.

7       Q    Okay.  From who does he receive calls?

8       A    He receives calls from friends, family, and any

9   type of business that he needs to take care of.

10      Q    On your phone?

11      A    On his cellphone.

12      Q    Okay.  I'm sorry.  That was more my question.

13      A    Okay.

14      Q    Is there -- are there situations where your

15  husband talks on your phone?

16      A    No.

17      Q    Okay.  Are there situations where you talk on

18  his phone?

19      A    No.

20      Q    Okay.  Do you communicate a lot by phone

21  yourselves?

22      A    Yes.

23      Q    Okay.  What kind of phone does he use?

24      A    Same as mine: Samsung Galaxy S7.

25      Q    If you're anything like my wife and I, we've

Page 26

1    tended to move in pairs through phones models.

2        A    Correct.

3        Q    We use Droid Turbo, so...

4        A    Yeah.

5        Q    That's generally how it's been?

6        A    Yes.

7        Q    Have you ever lost either your Samsung S6 or

8    your Samsung S7 for any period of time?

9        A    No, I have not.

10       Q    Have you ever had the service deactivated on

11   your Samsung S6 or Samsung S7?

12       A    No.  It has never been terminated, no.

13       Q    Okay.  Not for a place where you might have

14   missed a bill or anything like that?

15       A    No, I've always worked with them on payment

16   arrangements so that way that would not happen.

17       Q    Okay.  Do you have a landline phone?

18       A    Yes.

19       Q    What's the landline number?

20       A    813-654-1574.

21       Q    Who provides your landline phone service?

22       A    Frontier.

23       Q    Frontier, the company formerly known as FiOS?

24       A    Yes.

25       Q    Okay.

Page 27

1       A      Verizon FiOS.

2       Q      Okay.  How long have you had Frontier service?

3       A      Whenever they did the switch.

4       Q      Well, how long had you had FiOS before the

5    switch?  In other words, you've been --

6       A      Sure.  As soon as I moved in, we changed to

7    FiOS.

8       Q      As soon as you moved in to Shilo Court?

9       A      Correct.

10      Q      That's where your phone has always come from.

11   Is that what I understand?

12      A      I'm sorry?

13      Q      Well, okay.  Shilo Court, your present

14   address --

15      A      Correct.

16      Q      -- you've been there for about the past three

17   and a half years?

18      A      Correct.

19      Q      So sometime in 2014 you moved in?

20      A      Correct, September.

21      Q      Do you remember when?

22      A      September.

23      Q      September.

24             All right.  So in September, when you moved in

25   to Shilo Court, you had FiOS installed?

Page 28

1       A     Correct.

2       Q     What services with FiOS did you obtain?

3       A     Internet, cable and phone.

4       Q     All right.  And so the number 654-1575 has been

5   your home phone --

6       A     1574.

7       Q     1574.  Thank you.  I apologize.

8             That has been your home telephone number since

9   moving into Shilo Court in September of 2014?

10      A     Correct.

11      Q     Got it.  Do you have any other cellphone

12  providers?

13      A     No, I do not.

14      Q     All right.  Have you ever had any other

15  cellphone provider besides Sprint?

16      A     No, I have not.

17      Q     Now, the FiOS question leads me into kind of

18  some of my next questions, which deal with Bright House

19  Networks now known as Spectrum.

20            Was there a time when you had received services

21  from Bright House Networks?

22      A     Yes.

23      Q     Okay.  Do you remember when you initially signed

24  up for Bright House Networks service?

25      A     When we moved here in 2004, we utilized

Page 29

1    Bright House.

2        Q    All right.  And where were you living at that

3    time?

4        A    Clearwater.  I think I forgot to mention

5    Clearwater.

6        Q    Well, I think I started getting more general

7    once we got back to the Riverside Drive address.

8        A    Sure.

9        Q    I'm assuming this predates that?

10       A    Yes.

11       Q    Okay.  When you moved to Tampa, where did you

12   live?

13       A    I moved -- when I moved from Tampa?

14       Q    Um-hmm.  Or when you -- I'm sorry.  When you

15   moved here in 2004 is what I think you said.

16       A    Yes.

17       Q    Where did you move to, and where was your

18   address?

19       A    I moved to Clearwater --

20       Q    Uh-huh.

21       A    -- and the address was off U.S. 19.

22       Q    All right.  And so that was the first place

23   where you got Bright House service?

24       A    Correct.

25       Q    Okay.

9e4239cd-b653-466a-8652-401f62ad8661

1      A     Actually, I still had Bright House service back

2   in Titusville as well.

3      Q     Still right this minute?

4      A     Yeah.  Well, no, not -- I don't have service

5   myself --

6      Q     Uh-huh.

7      A     -- but they -- that's where I initially started

8   my service was in Titusville.

9      Q     Oh, okay.  Understood.  Okay.  So I see what

10  you're saying.  Even in Titusville --

11     A     I had Bright House.

12     Q     -- Bright House was a provider?

13     A     Correct.

14     Q     Okay.  Remember, by the way, that tendency to

15  anticipate the answer to the question and start to give

16  the answer.  I think we may be starting to do that just a

17  little bit, and I need to remember as much as you.  Even

18  if I think you're done with your answer, I need to make

19  sure you are so we don't speak over each other.

20          All right.  All right.  So when you moved in in

21  Clearwater off U.S. 19 in 2004, you signed up for some

22  Bright House service at that point?

23     A     Yes.

24     Q     Did you continually keep Bright House from then

25  on through all your other addresses until you moved from

9e4239cd-b653-466a-8652-401f62ad8661

Page 31

1    6010 North Cameron to 2614 Shilo?

2        A    I'm sorry.  Repeat the question.

3        Q    Yeah, that was a -- there was a lot going on in

4    that question.

5             You had Bright House in that first place you

6    lived in Tampa Bay, in Clearwater off 19 in 2004?

7        A    Correct.

8        Q    The next place you moved, did you transfer your

9    Bright House service to there or sign up for new

10   Bright House service there?

11       A    When we moved to 2614 Shilo --

12       Q    Okay.

13       A    -- we got rid of Bright House.

14       Q    Right.  And your -- and your services were kind

15   of continually provided by Bright House at all of the

16   places you lived before then?

17       A    That is correct.

18       Q    Okay.  What services were you receiving from

19   Bright House in particular at 6010 North Cameron?

20       A    Internet, phone, and cable.

21       Q    Okay.  You moved into the 6010 North Cameron

22   address, we're thinking, sometime in 2010, 2011.  Would I

23   be right about that?

24       A    Possibly.

25       Q    Was there ever a time when service was

Page 32

1    disconnected and had to be reconnected at that location?

2         A    No.

3         Q    Was there ever a time where you upgraded

4    services or needed them to come out and repair something?

5         A    We upgraded our Internet speed.

6         Q    Do you remember when that was?

7         A    No, I do not.

8         Q    All right.  I think this is probably as good a

9    time as any to mark for identification Exhibit 2, and the

10   driver's license will be Exhibit 1 to the deposition.

11        (Exhibit Number 2 marked for identification.)

12   BY MR. SMITH:

13        Q    I will put this sideways so it doesn't obscure

14   any of the writings.  I'm handing a copy to your counsel

15   and a copy to you.

16        Have you ever seen that document before?  And

17   just take a minute or as long as you need to review it

18   before you answer questions, if you'd like.

19        A    Yes, this is -- yes, it's recognizable.

20        Q    When you say "it's recognizable," how do you

21   recognize it?

22        A    It's a work order.

23        Q    Uh-huh.  Do you have -- now, at the top it says

24   "Bright House," and then it says "work order" in the

25   upper right-hand corner.  Right?

Page 33

1     A     Correct.

2     Q     It also says "Receipt" up there?

3     A     Correct.

4     Q     If you look down in the lower left-hand corner,

5     there's a place that says "Customer Signature."  Do you

6     see that?

7     A     Yes.

8     Q     Is that your signature?

9     A     Yes, it is.

10    Q     Okay.  Now, there appears to be a date two

11    fields up and to the left of your signature that says

12    "7/26/14."  Do you see that?

13    A     Yes.

14    Q     Do you have a recollection of July 26, 2014,

15    someone from Bright House coming to your -- coming to

16    your home?

17    A     That was after I moved, yes.

18    Q     Okay.  And -- and -- and as it turns out, the

19    address listed for this particular work order is 2614

20    Shilo Court.  Right?

21    A     Correct.

22    Q     Now, does that refresh your recollection that

23    perhaps you did have Bright House at the Shilo Court

24    address?

25    A     No, I actually had a router from them that they

Page 34

1    were coming to pick up.

2       Q    Coming to pick up.  So --

3       A    At that time the technician also stated to me to

4    hold on to the work order receipt because they were

5    notorious for losing them.

6       Q    It's your testimony then that this document

7    reflects them picking up equipment and not putting

8    equipment there?

9       A    Correct.

10      Q    Okay.  Take a minute to look at it and tell me

11   if you see anything that would suggest that.

12      A    Suggest -- I apologize.  I don't understand the

13   question.

14      Q    Okay.  Is there any way I can tell by looking at

15   this document that it's a pickup receipt rather than a

16   reconnect/restart, which is what it seems to say in the

17   job description?

18      A    I believe right under the "Notes to Technician"

19   it says "pick up equipment, no code," no C-o-d.  It's

20   only pick up equipment.

21      Q    Okay.  But you do see up in the job description

22   "reconnect/restart."  Right?

23      A    Which paragraph?  I apologize.  I don't see --

24      Q    In the upper right-hand corner, you'll see the

25   work order states -- there's "technician," there's "job

Page 35

1    description" and "job number" across the top?

2       A    Sure.

3       Q    And it says, "Technician: 7199, Job Description:

4    Reconnect/restart." Do you see that?

5       A    Yes.

6       Q    Does that refresh your recollection that they

7    may have been reconnecting or restarting service at your

8    address on that day?

9       A    I believe when we moved in first to Shilo, we

10   did have Bright House --

11      Q    Okay.

12      A    -- for a very short period of time.

13      Q    Okay.

14      A    And then we switched to Verizon because we were

15   receiving better service from them.

16      Q    As a Bright House customer, I can't tell you

17   that I completely disagree.  Well, I've never been a

18   Verizon customer, so I wouldn't know.

19           All right.  So you mentioned that the type of

20   equipment they perhaps were there to pick up was a

21   router?

22      A    Correct.

23      Q    What kind of router?

24      A    It was one that they provided.

25      Q    And when we talk about a router, we're talking

1    about something that actually can create a network within

2    the home.  Right?

3        A    Correct.

4        Q    Is that a Wi-Fi network?

5        A    Yes, it was.

6        Q    So you had a Wi-Fi I network in your home at

7    Shilo Court?

8        A    Yes.

9        Q    Okay.  And even after you stopped being with

10   Bright House, did you maintain a Wi-Fi network of some

11   type?

12       A    Yes.

13       Q    And you did that with equipment provided by

14   Verizon?

15       A    Correct.

16       Q    All right.  Was Bright House also your supplier

17   of cable television?

18       A    Yes, they were.

19       Q    For a time at least?

20       A    Yes.

21       Q    And then Verizon started fulfilling that role?

22       A    Yes.

23       Q    Okay.  And were -- was there ever a time when

24   Bright House provided you with a landline phone?

25       A    Yes.

Page 37

1    Q    Okay.  And was that phone number 813-644-7932?

2    A    That does sound familiar.

3    Q    All right.  The router, I use mine for a variety

4  of things.  There are cameras in my house that are on it.

5         As a technological person, do you have that kind

6  of setup with your Wi-Fi?

7    A    I do not have cameras.

8    Q    Okay.  Do you use your phone over Wi-Fi?

9    A    Yes, I do.

10   Q    Did you use your phone over Wi-Fi at the time

11  that Bright House had provided you the router?

12   A    When they provided me the router?

13   Q    Was there a time when you were making and

14  receiving Wi-Fi calls using the Bright House router?

15   A    Yes.

16   Q    Okay.  And was there a time when you were making

17  or receiving Wi-Fi calls using the Verizon router?

18   A    Yes.

19   Q    Okay.  When you're home, do you make Wi-Fi

20  calls, or do you make cellular calls using network?

21   A    I make Wi-Fi calls.

22   Q    And that's been true as long as you've had that

23  capability?

24   A    Sure.

25   Q    All right.  Do you use -- did you use your

9e4239cd-b653-466a-8652-401f62ad8661

Page 38

1   Bright House equipment to assist you in working from

2   home, as we've talked about with your two employers?

3       A    Yes.

4       Q    Okay.  And did you use your Verizon equipment to

5   assist you in working from home, as you've done for your

6   two --

7       A    Yes.

8       Q    -- employers?

9            All right.  Who paid the cable bill?  And I

10  guess I should break that up into who paid the

11  Bright House cable bill when you were receiving one?

12      A    Myself.

13      Q    Okay.  And who pays the Verizon bill -- or

14  Spectrum -- or Frontier bill now?

15      A    I do.

16      Q    Okay.  Did there ever come a time when

17  Bright House disconnected your service?

18      A    Bright House for nonpayment, yes.

19      Q    Okay.  Do you remember about when that was?

20      A    Probably back in 2009, 2008, somewhere around

21  there.

22      Q    So they did not disconnect the service for

23  nonpayment when you were at Shilo Court?

24      A    No, they did not.

25      Q    Did they disconnect any service for nonpayment

Page 39

1    when you were at Cameron, at the Cameron address?

2        A    Did they ever shut service off at the Cameron

3    address?

4        Q    Yes.

5        A    Yes.

6        Q    Okay.  Do you remember about when that would

7    have been?

8        A    No, I do not.

9        Q    So when you switched from Bright House to

10   Verizon, was there an unpaid balance that remained with

11   the account?

12       A    No.

13       Q    Okay.

14       A    In order to get the services cut back on, you

15   have to pay the bill in full.

16       Q    But is that true when you go from Bright House

17   to a different company?

18       A    Yes.

19       Q    So, in other words, FiOS -- Verizon FiOS --

20   would not have signed you up unless they were -- unless

21   they had some proof that you had satisfied your

22   Bright House bill?

23       A    No.

24       Q    Okay.  So you could have obtained new services

25   without satisfying a balance, if you had one?

9e4239cd-b653-466a-8652-401f62ad8661

Page 40

1      A     I'm confused.  I'm not understanding --

2      Q     Okay.

3      A     -- the question.

4      Q     If -- let's say while you're living at Shilo

5    where you had Bright House for a period of time --

6      A     Sure.

7      Q     -- let's say that you decided to change

8    companies --

9      A     Sure.

10     Q     -- and that there was a bill outstanding at that

11   time.

12     A     No.

13     Q     Oh.  Well, I'm just asking you to assume.  But

14   let's back up a step.

15           Was there an outstanding balance when you

16   changed from Bright House to FiOS?

17     A     No --

18     Q     Okay.

19     A     -- not to my knowledge.

20     Q     Now, you mentioned that the technician who, at

21   least on this visit, might have suggested to you that you

22   retain a receipt?

23     A     Correct.

24     Q     Okay.  Did you retain a receipt?

25     A     I have misplaced it someplace.

9e4239cd-b653-466a-8652-401f62ad8661

Page 41

1    Q    All right.  How about any of the bills that
2    you've paid over the years for Bright House?
3    A    Those have been long gone.  I pay them, and I
4    throw them out.
5    Q    Okay.  If you -- so it's your testimony that
6    when you stopped using Bright House services in 2014 at
7    the Shilo Court address and moved to Verizon FiOS, you
8    had no outstanding balance with Bright House?
9    A    Correct.
10   Q    Is it also your testimony that you had no
11   Bright House equipment left over?
12   A    At that point I had the router still, and I
13   asked them multiple times to come pick it up.
14   Q    Okay.  Is there a Bright House service office
15   near your home?
16   A    Not that I'm aware of.
17   Q    Okay.  For example, I'm aware of one in Brandon
18   at the mall.
19   A    Oh, no.
20   Q    Oh.
21   A    I don't go to the mall.
22   Q    Right.  Did you ever look into returning the
23   router to one of their physical locations?
24   A    No.  They said they would send a technician out.
25   Q    Okay.  And did they ever do that?

9e4239cd-b653-466a-8652-401f62ad8661

Page 42

1      A    Yes, they did.

2      Q    Do you know when that happened?

3      A    On the 7/26/14 date.

4      Q    All right.  Well, tell me, if you look down

5   where your signature is again and you look up a little

6   higher where you see the "7/26/14" --

7      A    Sure.

8      Q    -- you see the words -- it's kind of faint in

9   the black bar there, but do you see the word "start" and

10  the word "stop"?

11     A    Yes.

12     Q    Okay.  "Start," can you see the handwriting

13  there, seems to say something like "3:30 p.m."?

14     A    Yes.

15     Q    Can you see the "stop" seems to say something

16  like "4:30 p.m."?

17     A    Yes.

18     Q    Do you know what took an hour to do at your home

19  on July 26, 2014?

20     A    They removed the router.

21     Q    It took an hour to remove the router?

22     A    They had to disconnect it.  They removed it.  We

23  had to do the paperwork, and at that point that's when

24  the technician told me that they've been having a lot of

25  issues with Bright House and to keep my receipt, because

1   they would charge me because they don't have a record of

2   it.

3       Q    Okay.  So it's your testimony that on July 26,

4   2014 a technician spent an hour at your home picking up a

5   router only?

6       A    Correct.

7       Q    All right.  Do you have any paperwork whatsoever

8   regarding your Bright House account?

9       A    No, I do not.

10      Q    Are there other companies -- strike that.

11           I guess it's your position that there was never

12   any unpaid obligation that you had to Bright House, at

13   least as far as your Cameron and Shilo Court addresses.

14   Is that right?

15      A    Repeat the question, please.

16      Q    I mean, obviously we're here about a lawsuit

17   where you claim someone was trying to collect a debt, and

18   it's my understanding that's an unpaid balance with

19   Bright House and possibly equipment.

20           It's your understanding that you do not owe

21   Bright House any money?

22           MS. STEINKRAUS:  Objection.  Form.

23   BY MR. SMITH:

24      Q    You can answer the question, if you know.

25      A    What was the question again?  I apologize.

9e4239cd-b653-466a-8652-401f62ad8661

Page 44

1      Q    The question is:  As we sit here -- well, is
2   it -- as we sit here today, do you owe Bright House any
3   money?
4      A    No, not that I know of.
5      Q    Okay.  And you don't have any Bright House
6   equipment?
7      A    No, I do not.
8      Q    Okay.  Are there other companies that you have
9   owed unpaid balances to in the past?
10      A    Such as?
11      Q    Such as the kind of unpaid balances that would
12   cause collection agencies to contact you.
13      A    Yes.
14      Q    Okay.  Who would some of those be?
15      A    Credit Protection Services.  They continually
16   called me about this equipment --
17      Q    Uh-huh.
18      A    -- and I knew I turned it in, and they were
19   stating that it was never turned in.
20      Q    Okay.  How about other collection agencies?
21      A    Credit cards, you know.  I do have a few of
22   those, and they -- I've worked with them and either
23   settled, or they actually charged things off because they
24   weren't able to prove the debt.
25      Q    Okay.  Are you familiar with an agency called

Page 45

1   Choice Recovery?

2       A     Choice Recovery?

3       Q     Um-hmm.

4       A     No.

5       Q     Have you ever been called by a collection agency

6   called Choice Recovery?

7       A     Not to my recollection.

8       Q     Have you ever been called by a credit collection

9   agency called Financial Credit Services?

10      A     That sounds familiar.

11      Q     Have you ever been called by a credit collection

12  agency called Glass Mountain Capital?

13      A     Not that I'm aware of.

14      Q     Have you ever been called by a collection agency

15  called Halsted Financial?

16      A     Not that I'm aware of.

17      Q     Have you ever been called by a credit agency

18  called Medicredit?

19      A     No.

20      Q     Have you ever been called by Midland Financial

21  Services?

22      A     No.

23      Q     Have you ever been called by National Patient

24  Account Services?

25      A     No.

Page 46

1    Q    Have you ever been called by Northwind Group?

2    A    No.

3    Q    Have you ever been called by Paralon?

4    A    No.

5    Q    Okay.  And one of the things that's been, I

6  think, suggested in this lawsuit is that Credit

7  Protection Association called you at odd hours?

8    A    That is correct.

9    Q    Did any of the other collection agencies we've

10  talked about call you at odd hours?

11    A    No, they did not.

12    Q    That's your testimony; no one besides Credit

13  Protection Association that's looking to collect a debt

14  has ever called you between the hours of 9 p.m. and

15  8 a.m.?

16    A    No, they've not.

17    Q    Do friends and family call you late at night

18  sometimes?

19    A    No, they don't.

20    Q    Has your husband ever called you at, say,

21  1 o'clock in the morning?

22    A    No.

23    Q    Has your husband ever called you at, say, 11:30

24  at night?

25    A    Yes.

1     Q    Okay.  What would be some circumstances where he

2     would do that?

3     A    We're normally together all the time, so it's

4     just, "Hey, where are you at?"

5     Q    Okay.

6     A    You know, or "I'm running late," that kind of

7     thing.

8     Q    But it's your testimony that he has never called

9     you after 1 o'clock in the morning?

10    A    No.

11    Q    Okay.  Let's talk about Credit Protection

12    Association for a second.  When did they start calling

13    you?

14    A    When did they start calling?

15    Q    Uh-huh.

16    A    I want to say it was about around July.  It was

17    definitely in 2014, maybe even later than July.

18    Q    Sometime in July --

19    A    Yeah.

20    Q    -- of 2014 --

21    A    Correct.

22    Q    -- or later?

23    A    Or later.

24    Q    Okay.  Do you know when they stopped?

25    A    When I finally gave them the attorney

9e4239cd-b653-466a-8652-401f62ad8661

Page 48

1    information.

2        Q    When you say "the attorney information," what do

3    you mean?

4        A    My attorney who's representing me --

5        Q    Uh-huh.

6        A    -- Michael Ziegler.

7        Q    Did you tell Credit Protection Association you

8    had an attorney by the name of Michael Ziegler?

9        A    Yes, I did.

10       Q    All right.  So let's start from the first time

11   they called you.  Do you -- did you answer that call?

12       A    I did.

13       Q    Okay.  And what was -- what did you hear when

14   you answered the call, or what did that conversation go

15   like, or how did that go?

16       A    They stated that I owed an outstanding balance.

17   And I asked them for what.  And they said -- stated it

18   was work equipment.

19       Q    Uh-huh.

20       A    And I advised them that the equipment was turned

21   in and that the technician did provide me with a receipt;

22   however, I could not find it.

23       Q    Okay.  That was the very first conversation you

24   ever had with CPA?  And the first time --

25       A    Yes.

Page 49

1     Q     -- they ever -- I'm sorry.  I should have waited

2  for your answer.

3           That was the very first conversation you ever

4  had with CPA?

5     A     Yes.

6     Q     Okay.  And that happened because you answered

7  the very first call you ever received from them?

8     A     Yes.

9     Q     Did they call again after that?

10    A     Yes.

11    Q     Did you answer that call?

12    A     Yes.

13    Q     And how did that conversation go?

14    A     I asked them to stop calling.

15    Q     Did they call again after that?

16    A     Yes, they did.

17    Q     Did you answer that phone call?

18    A     Yes, I did.

19    Q     And what kind of conversation -- did you have a

20  conversation at that point?

21    A     Yes, I did.  I had several conversations with

22  different representatives; and they decided to speak over

23  me, be very rude, and didn't want to work with me.

24    Q     Well, let me -- I'll get back to this in just a

25  second.  Let's start with the first call.

Page 50

1       A     Sure.

2       Q     Do you remember who you spoke to?

3       A     No, I do not.

4       Q     Do you remember the gender of the person you

5    spoke to?

6       A     No, I do not.

7       Q     Do you remember if the person had an accent?

8       A     No.

9       Q     What did, specifically, that person say to you?

10      A     That they were from Credit Protection Services,

11   and they were calling to collect on a debt.

12      Q     Okay.  And at that point, what did you say?

13      A     I said, "Okay."

14      Q     Uh-huh.

15      A     And I started listening.  I said, "What was the

16   debt for."

17      Q     And what did they say?

18      A     They said it was for Bright House Networks, and

19   it was for equipment.

20      Q     Okay.  And what did you say after that?

21            MS. STEINKRAUS:  Objection.  Form.

22   BY MR. SMITH:

23      Q     What did you -- you can answer the question.

24      A     I stated that I did not owe the balance --

25      Q     Uh-huh.

9e4239cd-b653-466a-8652-401f62ad8661

1     A     -- that the equipment had been turned in, and I

2   owe them nothing.

3     Q     Okay.  What did they say?

4     A     They stated, "You have a balance with us with --

5   for 600-and-something dollars for equipment."

6     Q     And it's your testimony that conversation took

7   place in the first phone call you ever received from CPA?

8     A     Maybe not the first phone call, but it was

9   within the first few phone calls.

10    Q     And by "few," do you mean first two or three?

11    A     No, first ten calls.

12    Q     Okay.  Okay.  So what else did you tell them?

13    A     I repeatedly asked them to stop calling me.

14    Q     In the first phone call, did you ask in that

15  first conversation?

16    A     No.  The first conversation, no.

17    Q     Okay.  So at what point did you ask them to stop

18  calling you?

19    A     Well, after they were calling me three times a

20  day --

21    Q     Uh-huh.

22    A     -- I asked them politely to please stop calling

23  me --

24    Q     Okay.

25    A     -- that they were harassing me.

1      Q      How many times would you say they had called
2   before you told them to stop calling you, please?
3      A      I want to say probably 10, 15 calls.
4      Q      But well before that, there's no doubt in your
5   mind you had a conversation with them and told them you
6   didn't owe them any money or equipment.  Right?
7      A      Correct.
8      Q      Okay.  And that would have had to have taken
9   place in the year 2014.  Right?
10     A      Correct.
11     Q      Okay.  How did you know it was CPA that was
12  calling you?
13     A      They identified themselves.
14     Q      Did you answer every call?
15     A      Not every call, no.
16     Q      How did you know they had called if you didn't
17  answer certain calls?
18     A      Their phone number and name popped up onto my
19  caller ID.
20     Q      Okay.  And is that through your Samsung S6 at
21  the time?
22     A      That was through my S7.  No, no.  I apologize.
23  It was through my S6.
24     Q      Okay.  Just normal caller ID is what caused that
25  to happen?

9e4239cd-b653-466a-8652-401f62ad8661

Page 53

1      A     I have an app on my phone called PrivacyStar

2      that I purchased.

3      Q     Uh-huh.

4      A     And after they repeatedly called me numerous,

5      numerous times, I then filed a complaint --

6      Q     Okay.

7      A     -- through the app.

8      Q     All right.  What is the latest time of day or

9      night that CPA ever called you?

10     A     They would call me up to right at like

11     9 o'clock.

12     Q     Okay.  Did they ever call you after 9 o'clock?

13     A     I would start receiving weird phone calls at

14     different times of the night that would scare me because

15     I've told my friends and family, if you're ever somewhere

16     and you need a ride, if you're inebriated or anything, to

17     call me.  So I sleep with my cellphone next to my bed on

18     my nightstand.

19     Q     Sure.

20     A     So the phone goes off at 1 o'clock in the

21     morning, I'm answering it, thinking it's family or

22     someone in trouble.  And it hangs up, and I look at the

23     phone number, and it's an 800 number.

24     Q     So it's your testimony that your phone rang at

25     1 o'clock in the morning, you answered it, there was a

Page 54

1     hang-up, and you looked at the number, and it was an 800

2     number?

3         A     Correct.

4         Q     And what makes you think that 800 number was

5     Credit Protection Association?

6         A     Because I went back through my phone logs and

7     made sure it was the same number that was calling me.

8         Q     Okay.  It is your testimony you received calls

9     from CPA at 1:00 in the morning?

10        A     Yes.

11        Q     And they were the only -- of all of the

12    collection agencies contacting you, they were the only

13    one that ever called you after 9 p.m.  Is that your

14    testimony?

15        A     That is my testimony.

16        Q     Okay.  Did you ever hear a -- did you ever hear

17    a recorded voice, or was it always a person?

18        A     It started off as a recorded voice, and then I

19    would have to wait for a live person to get on the phone.

20        Q     How many times would you say you did that?

21        A     That -- when I was actually speaking with them

22    for the first part of everything; and then after that, I

23    just -- I blocked them and put them on my do-not-accept

24    list.

25        Q     Okay.  So at what point did you put them on your

9e4239cd-b653-466a-8652-401f62ad8661

1    blocked do-not-accept list?

2        A    After I told them repeatedly to stop calling me.

3        Q    Uh-huh.  So when you say you put them on your

4    blocked do-not-call list, that was accomplished through

5    the PrivacyStar application.  Correct?

6        A    That is correct.

7        Q    Okay.  So there came a time where you passed the

8    "block" option with regard to Credit Protection

9    Association?

10       A    Yes.

11       Q    What happened after that?

12       A    They would still keep calling.

13       Q    How did you know they called?

14       A    The app itself actually shows when they still

15   call.

16       Q    Does the phone still ring?

17       A    Yes, it does.

18       Q    Okay.  How many times does it ring?

19       A    It rings up to 30 seconds.

20       Q    Did you ever answer any of the calls after you

21   put them on block?

22       A    Yes, I did.

23       Q    Okay.  When did you do that?

24       A    I cannot remember the exact date.

25       Q    When did you first put them on block?

Page 56

1        A     I want to say sometime in 2015.

2        Q     Okay.  All right.  So you mentioned earlier that

3    sometimes the voice you would speak to, or voices.  And

4    is there any one of them you can give me a name on?

5        A     No, I cannot.

6        Q     Is there any one of them you can give me

7    anything that stuck out about them?

8        A     That one basically yelled at me and said he

9    didn't -- didn't want to hear anything that I had to say.

10       Q     Well, let's talk about --

11       A     Yep.

12       Q     -- what specifically he said when he was yelling

13   at you.

14       A     That -- basically that I owe this balance and

15   they're there to collect on the balance.

16       Q     Uh-huh.

17       A     And I advised them that I had told them several

18   times to stop calling me.  And she said that doesn't

19   matter, and it just -- it continued.  I just -- I

20   actually had to hang up on the person.

21       Q     Okay.  So this is all one call.  Someone said

22   you owe the balance, they're going to collect on the

23   balance, and it doesn't matter whether you want them to

24   stop or not?

25       A     Correct.

Page 57

1      Q      What else did you tell them?

2      A      I told them, "I've told you several times to

3  stop calling me. "

4      Q      What else did they tell you?

5      A      They stated that they needed it in writing.

6      Q      How are you -- you've talked to a lot of

7  collection agents over the past several years, haven't

8  you?

9      A      I have.

10      Q      Is it possible at all that you're confusing

11  Credit Protection Association with the collection

12  agencies of those other companies?

13      A      No.

14      Q      How do you know?

15      A      Because the other collection companies have

16  stopped calling me.

17      Q      But have any of them ever told you they were

18  going to continue to collect your balance whether you

19  told them to stop or not?

20      A      Nope.  They've actually stopped calling me.

21      Q      Only CPA?

22      A      Only CPA.

23      Q      Okay.  Because you had a conversation where you

24  told them to stop calling and they kept calling; that's

25  your testimony?

9e4239cd-b653-466a-8652-401f62ad8661

Page 58

1      A     That is my testimony.

2      Q     Okay.  And that happened very quickly within the

3   first 10 calls of you starting to receive calls?

4      A     Probably about the first 20 calls or so, yes.

5      Q     Well -- that's fine.  Was there ever anything

6   they told you that you want to share with me about other

7   than that you owe the balance, they're going to continue

8   to collect, and it doesn't matter whether you say stop

9   calling?

10     A     I don't understand the question.

11     Q     I want to make sure there's nothing else they

12   told you in the -- in terms of being rude and yelling.

13   So I want to hear everything they've said to you that you

14   found rude or aggressive.

15     A     They would just straight-up talk over you, and

16   they didn't want to listen to me as to what I was telling

17   them.  All they cared about was, "You owe a balance and

18   we're going to get it because I want my commission."

19          They wouldn't say that "I want my commission,"

20   however, but they -- they were very aggressive with

21   trying to collect.

22     Q     In what ways did they try to collect besides --

23   anything that you haven't already told me about what --

24   about them just telling you you owe it and they're going

25   to keep collecting?

1      A     Correct.

2      Q     That's the extent of what they said.  Right?

3      A     Correct.

4      Q     Okay.  Did they ever communicate with you by any

5  means other than telephone call?

6      A     No.

7      Q     So you never received any letters from CPA?

8      A     No.

9      Q     Did you ever write any letters to CPA?

10     A     No.

11     Q     Were all of these calls them calling you and you

12  answering the phone, or was there ever a call where you

13  called a number to reach them?

14     A     Was there ever a time where I called them to

15  reach them?

16     Q     Correct.

17     A     No.

18     Q     Okay.  Now, did you keep any notes of these

19  calls?

20     A     No, I didn't.

21     Q     So there was no time when you wrote down or

22  annotated --

23     A     I never anticipated having to go like this, no.

24     Q     Okay.  All right.  Was there ever any means that

25  they contacted you besides telephone or letter?

9e4239cd-b653-466a-8652-401f62ad8661

Page 60

1      A    No.

2      Q    All right.  If I can, I'd like to mark this as

3   what I would think would be Exhibit 3, so I'll just take

4   that sticker here.

5           (Exhibit Number 3 marked for identification.)

6   BY MR. SMITH:

7      Q    I'm handing you what I've marked as Exhibit 3 to

8   your deposition.  I'm handing a copy to your counsel.

9           Ms. Garrett, I've just handed you what's been

10  marked as Exhibit 3 to your deposition.  Do you recognize

11  this document?

12     A    Yes, I do.

13     Q    Is that your signature at the lower right-hand

14  corner of the document?

15     A    Yes, it is.

16     Q    Thank you.  I'll gather these up so they're not

17  in your way.

18          At some point you retained an attorney for this

19  matter.  Right?

20     A    Correct.

21     Q    When did that happen?

22     A    It was when I actually used my app, the

23  PrivacyStar app, filed the complaint.

24     Q    Uh-huh.

25     A    They had a feature in there that states:  "Do

Page 61

1    you want to be contacted by an attorney?"  I stated yes.

2         Q    Uh-huh.

3         A    And that's when the law office of Michael

4    Ziegler contacted me and was reviewing everything that I

5    stated.

6         Q    Now, have you ever pressed the complaint button

7    and asked to be referred to an attorney for any other

8    collection agency besides CPA?

9         A    No.

10        Q    That's your testimony.  Right?

11        A    That's my testimony.

12        Q    You've never done that?

13             Okay.  Have you ever filed a complaint using the

14   app on any collection agency besides CPA?

15        A    No.

16        Q    Have you ever blocked any other credit agency

17   besides CPA?

18        A    No.

19        Q    Did you do any research on CPA?

20        A    No.

21        Q    After you filed a complaint and said you'd be

22   happy to be contacted by an attorney, is that when

23   Mike Ziegler contacted you?

24        A    Yes.

25        Q    Okay.  And I don't want to know anything that

Page 62

1    you may have ever discussed with Mr. Ziegler or with your

2    counsel that's here today.

3           Did any lawyers besides the Ziegler firm contact

4    you after you pressed the complaint button and said it

5    would be okay to be contacted by an attorney?

6       A    No.

7       Q    All right.  Did you sign an engagement letter

8    with the Ziegler firm?

9       A    Yes.

10      Q    Okay.  Do you remember when that was, and I

11   don't want to know anything in it.

12      A    When was that?  When did we start?  November,

13   was it?  Aah.  I know I signed the affidavit in November.

14      Q    Um-hmm.

15      A    So whenever the complaint was filed.  I'm not

16   exactly sure which date.

17      Q    And everything in that affidavit, that's your

18   sworn testimony.  Correct?

19      A    Yes.

20      Q    Okay.  Do you have PrivacyStar on your S7?

21      A    Yes.

22      Q    Uh-huh.  I use PrivacyStar.  Did you have

23   PrivacyStar on your S6?

24      A    Yes, I did.

25      Q    Do you know if there's data on your S7 in

Page 63

1    PrivacyStar that is there from the time you had

2    PrivacyStar on your S6?

3        A    No.

4        Q    You don't think so, or you don't know?

5        A    I don't believe so.

6        Q    Okay.  Have you ever created a data printout of

7    your PrivacyStar information?

8        A    No, I wasn't aware I could do that.

9        Q    If your attorneys had given me a PrivacyStar

10   log, where would they have gotten it from?

11           MS. STEINKRAUS:  Objection.  Form.

12   BY MR. SMITH:

13       Q    You can answer the question.

14       A    From my understanding it was -- I purchased it

15   through the Google app store --

16       Q    Um-hmm.

17       A    -- and it was -- it was on my phone at that

18   point.

19       Q    No, I know where you probably obtained it.  I

20   mean, now, a question:  Did PrivacyStar come with your

21   phone, or did you go to Google Play and download it?

22       A    I downloaded it.

23       Q    Okay.  Do you remember when you first did that?

24       A    It's been a few years.  I want to say definitely

25   around the 2014, if not sooner, time.

Page 64

1      Q    Okay.  All right.  And you don't know whether it

2   can produce a log of all of the calls that it blocks?

3      A    I'm sure -- I'm sure there is a feature on that,

4   yeah.

5      Q    Have you ever seen what the log for your phone

6   looks like?

7      A    Yes.  I've gone through it.  Well, it's a log

8   that coincides with my incoming call log --

9      Q    Right.

10     A    -- and I go to it sometimes to find out who this

11  unknown phone number is that's calling me.

12     Q    Okay.  Let me go with 4 here.

13          (Exhibit Number 4 marked for identification.)

14  BY MR. SMITH:

15     Q    I'm handing you what's been marked for

16  identification as Exhibit 4 to your deposition.  I am

17  handing a copy to your counsel.

18          Is that your phone number at the top,

19  727-452-4687?

20     A    Correct.

21     Q    Okay.  Do you see that it's a three-page

22  document?  Oh, and there's a fourth page.  That's what we

23  call a slip sheet.  I think that came with your

24  attorney's cover letter, cover --

25     A    Yes.

Page 65

1      Q      -- of this.

2      A      Yes.

3      Q      Is this the PrivacyStar log from your phone?

4      A      It appears to be, yes.

5      Q      Okay.  Thank you.

6             Did you agree to any terms and conditions when

7      you signed up for PrivacyStar?

8      A      I had to agree to their terms and conditions,

9      yes.

10     Q      Okay.  Let's go with Exhibit 5 here.

11            (Exhibit Number 5 marked for identification.)

12     BY MR. SMITH:

13     Q      I'm handing you what's been premarked for

14     identification as Defendants' Exhibit 5 to your

15     deposition and handing a copy to your counsel.  The title

16     is "Plaintiff's Verified Responses to the Court's

17     Interrogatories to the Plaintiff."

18            Have you ever seen this document before?

19     A      Yes, I believe so.

20     Q      Okay.  If you flip to page 12, do you see it

21     says "Plaintiff's Signature"?

22     A      Yes.

23     Q      Is that your signature?

24     A      It is.

25     Q      And this says it was notarized by a Lynn Delfino

Page 66

1    of the Ziegler law firm?

2        A    That's correct.

3        Q    Do you remember signing that document in

4    Ms. Delfino's presence?

5        A    Yes, I do.

6        Q    And the information in these interrogatory

7    answers is true and accurate to the best of your

8    recollection.  Correct?

9        A    That is correct.

10       Q    Okay.  Thank you.  I'll take that back and put

11   it in the file over here.

12            MR. SMITH:  All right.  Kaelyn, this is

13       sometimes an -- oop.  Hold on.  This is

14       sometimes a tricky area.

15            Are you familiar with the recording

16       produced by the defendant in this case?

17            MS. STEINKRAUS:  Yes.

18            MR. SMITH:  Okay.  I'm going to play that

19       recording.  I would like -- if we're able to, I

20       would like us to stipulate on the record that

21       what I play is the one that's been produced in

22       discovery.  Otherwise it turns into a thing of

23       burning a CD with this on it and attaching it as

24       an exhibit to the deposition.

25            MS. STEINKRAUS:  That's fine.  After we

9e4239cd-b653-466a-8652-401f62ad8661

Page 67

1    listen to it --

2         MR. SMITH:  You'll be able to tell me

3    whether you agree that that's the recording or

4    not.  Right?

5         MS. STEINKRAUS:  Yes.

6         MR. SMITH:  Very good.

7         THE COURT REPORTER:  Wait.  Before you do

8    that, are you going to want me take down what

9    they're trying to say or no?

10        (There was an off-the-record discussion.)

11   BY MR. SMITH:

12   Q    Ms. Garrett, what I'm going to do is I'm going

13   to play you a recording.  I'm representing to you that

14   this is a recording produced by my client in discovery to

15   your attorneys.

16   A    Sure.

17   Q    After it's played, I want to give your attorney

18   just a second to see if she agrees that this is the

19   recording we produced; and that way, when we talk about

20   this recording on the record here in this deposition,

21   everyone will know we're referring to the one that

22   Defendant CPA produced in the discovery process.  So

23   that's what we're about to do.

24        MR. SMITH:  Does that make sense, Kaelyn?

25        MS. STEINKRAUS:  Yes.

1           MR. SMITH:  Okay.  Let's just go ahead and

2       listen to it first then.

3           (Recording played.)

4           MR. SMITH:  Okay.  Kaelyn, do you agree

5       that's the recording we produced in discovery?

6           MS. STEINKRAUS:  Yes.  It is the only

7       recording that they provided in discovery.

8           MR. SMITH:  Okay.  So for that purpose,

9       when I talk about "the recording," I'll be

10      referring to the one we produced in discovery,

11      and it won't actually be made an exhibit to this

12      deposition, and you also haven't -- Madam Court

13      Reporter, you also haven't transcribed it

14      because it -- yeah.  It's an independent piece

15      of documentary evidence is kind of the way I

16      look at it.

17  BY MR. SMITH:

18      Q    All right.  So the first question is:  Is that

19  your voice?

20      A    It is.

21      Q    So the person speaking to the CPA representative

22  is you?

23      A    Yes.

24      Q    Okay.  When did that call occur?

25      A    That -- the specific date, I'm not sure.  I know

Page 69

1    that was probably one of the last calls that I received

2    once I advised them I do have an attorney.

3        Q    Okay.  And by "attorney," you were referring to

4    Michael Ziegler?

5        A    Correct.

6        Q    All right.  Okay.  Was that the end of the

7    calls, as far as you recall it?

8        A    As far as I recall, yes.

9        Q    Okay.  Were there any calls after that phone

10   call?

11       A    Once I advised -- not that I can remember.

12       Q    So it's your testimony that the first time

13   that -- after you advised them you had an attorney, there

14   were no more calls?

15       A    Possibly, yes.

16       Q    Okay.  It's also your testimony there were calls

17   before that --

18       A    Yes.

19       Q    -- that you spoke to a CPA representative?

20       A    Yes.

21       Q    Okay.  And not some other collection agent?

22       A    No.

23       Q    Because you never had these kind of problems

24   with other collection agents.  Right?

25       A    Correct.

Page 70

1    Q    Okay.  Have you ever filed a lawsuit against
2    anyone before?
3    A    No, sir.
4    Q    Have you ever filed a lawsuit against any other
5    collection agency?
6    A    No, sir.
7    Q    Have you ever filed for bankruptcy?
8    A    No, sir.
9    Q    Okay.  Don't be offended, because this question
10   is asked of every witness that's ever sat for a
11   deposition before, I believe.
12        Have you ever been convicted of a felony?
13   A    No, I have not.
14   Q    Okay.  Have you ever been arrested for or
15   charged with a felony?
16   A    No, I have not.
17   Q    Just give me a minute here.  Has your testimony
18   been truthful and accurate to the best of your
19   recollection?
20   A    Yes, sir.
21   Q    Do you think it's likely at all that you're
22   going to remember later that you didn't -- that you
23   weren't able to recall today?
24   A    No.
25   Q    Okay.  You've given the most complete answers

9e4239cd-b653-466a-8652-401f62ad8661

Page 71

1    you can to my questions.  Correct?

2         A    Correct.

3              MR. SMITH:  Okay.  At this time, subject to

4         any follow-up your attorney may have, I am

5         complete with my questioning.

6         A    Okay.

7              MS. STEINKRAUS:  Plaintiff just requests

8         that we read.

9              MR. SMITH:  Okay.

10             MS. STEINKRAUS:  No questions.

11             MR. SMITH:  At this time your deposition is

12        concluded.  Thank you very much for your

13        patience and for coming down.

14             THE WITNESS:  Thank you very much.

15             THE COURT REPORTER:  Do you want this typed

16        up?

17             MR. SMITH:  I do.  Yeah, I'll order.

18             THE COURT REPORTER:  And do you want to

19        order a copy?

20             MS. STEINKRAUS:  Yes, please.  Well, I

21        think so.  Let's wait on that.

22             (Deposition concluded at 2:17 p.m.)

23

24

25

Page 72

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA          )

4    COUNTY OF HILLSBOROUGH )

5

6          I, BEVERLY REPLOGLE, RPR, Court Reporter, and Notary

7    Public, do hereby certify that I was authorized to and

8    did stenographically report the foregoing deposition of

9    ANGELA GARRETT; that a review of the transcript was

10   requested; and that the foregoing transcript, pages 1

11   through 71, is a true record of my stenographic notes.

12

13         I FURTHER CERTIFY that I am not a relative,

14   employee, or attorney, or counsel of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18         DATED February 28, 2017 at Tampa, Hillsborough

19   County, Florida.

20

21

22         _____
           BEVERLY REPLOGLE, RPR
23         Notary Public

24

25

9e4239cd-b653-466a-8652-401f62ad8661

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA          )

4    COUNTY OF HILLSBOROUGH  )

5         I, BEVERLY REPLOGLE, RPR, Notary Public, State of

6    Florida, certify that the witness, ANGELA GARRETT,

7    personally appeared before me on February 17, 2017 and

8    was duly sworn.

9         WITNESS my hand and official seal this date:

10   February 28, 2017.

11   Identification:

12        Personally Known _____

13   Or Produced Identification_____X_____

14   Type of Identification Produced:  Driver's License

15

16

17

18

19

20

21        _____
          BEVERLY REPLOGLE, RPR
          Notary Public, State of Florida
22        MY COMMISSION FF 946732
          EXPIRES 2/25/20

23

24

25

Page 74

1                   E R R A T A   S H E E T

2   IN RE:  ANGELA GARRETT vs. CREDIT PROTECTION ASSOCIATION,
            L.P.
3

    DEPOSITION OF:  ANGELA GARRETT     TAKEN:  02/17/2017
4

    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
5

    Please sign, date, and return this sheet to our office.
6   If additional lines are required for corrections, attach
    additional sheets.
7

    At the time of the reading and signing of the deposition,
8   the following changes were noted:

9   PAGE    LINE      CHANGE      REASON

10   44     15   Credit Protection Services to Credit Protection Association
                                                              due to slip
11   50     10   Credit Protection Services to Credit Protection Association  of tongue
                                                              due to slip
12   53     11   9 o'clock to 1 a.m. due to misunderstanding the  of tongue.
                                                              question.
13   58     4   first 10 calls instead of first 20 calls misunderstood the
                                                              question.
14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   Under penalty of perjury, I declare that I have read my
     deposition and that it is true and correct subject to any
23   changes in form or substance entered here.

24   SIGNATURE OF DEPONENT:  _Angela Garrett_____

25   DATE:  _3/17/17_____

9e4239cd-b653-466a-8652-401f62ad8661



RESTRICTIONS:

ENDORSEMENTS:
CLASS: E - Any non-commercial vehicle with a GVWR less than 26,001 lbs. or any RV

REPLACEMENT LICENSE REQUIRED WITHIN 10 DAYS OF ADDRESS OR NAME CHANGE.
The State of Florida retains all property rights herein.

Terry L. Rhodes
Executive Director
Clayton Boyd Walden
Director of Motorist Services
K731611180116
Rev Date 06-01-14

www.flhsmv.gov

8223/1300/0130

BRIGHT HOUSE NETWORKS
4145 S  FALKENBURG RD RIVERVIEW FL
(813) 684-6400

1001030568871028000I

**bright house** NETWORKS **WORK ORDER / RECEIPT**   PO:   1 OF

| TECHNICIAN | JOB DESCRIPTION | JOB # |
|---|---|---|
| 7999 | RECONNECT/RESTART | 938,651 |
| ROUTE # | ORDER NUMBER | PRINT DATE |
| 83843 | 1001030568871028000I | 07/25/14 |

GARRE T, ANGELA
2614 SHILO CT
VALRICO FL 33596-6321

| HOME PHONE | DATE | TIME | UNITS / CATG | REPRINT |
|---|---|---|---|---|
| 813-644-7931 | 07/26/14 | 4 2-4 | 001 01 | |
| WORK PHONE | CUSTOMER NUMBER | CALL FIRST | PRINT ID |
| 727-452-4687 | 1102562485840 | | NEXD |

RELOC/TRANSFER    ORDER REASONS

| CODE | QTY DISC | DESCRIPTION  CHARGE<br>WORK TO BE PERFORMED | CHARGE | OUTLET/  SERIAL NUMBER/ TYPE/OWNER<br>EQUIPMENT ADDRESS / COMPONENT |
|---|---|---|---|---|
| 1A  ~1A | 1 | NO VIDEO | 0.00 | / / |
| AA021-AA021 | 1 | REQSPRTNTO | 0.00 A | |
| D3D2V-D3D2V | 1 | WRLSHMNET3 | 3.00 | /VIDEO |
| M2C  ~M2C | 1 | MODEM | 0.00 B | E38BUA6BH535193, / |
| RS  ~RS | 1 | RR ONLY | 54.00 | /EMBEDDED MODEM |
| 35A  ~35A | 1 | 60MB WRLSD3 | 35.00 C | / / |
|  | | | | /HSD |

NOTES TO TECHNICIAN
1 PRE RR ONLY PICK UP EQ NO COD.

/SEC ACTIVATE #:      /SEC CONTACT PH#:      /SEC EMAIL REF:

/TYPE: RESID - 1 UNIT  /BQR: 28003700  /HE: FIBER/COUNTY  /HU TYPE: UNDERGROUND
/STATUS: SERV UPGRADED  /PO: OTHER 2  /TAQ: 5762225

ACCOUNT #: 8223 13 013 5947702  CURR BAL: 0.00   DEL $: 0.00   DEL #: 000
MULTIPLE ACCOUNTS CUST:

PU  ← AG ___ SAC PHH PHF   (KL 56)

PU  ← AG ___ SAC FPSSLL   (KL 56)

TG Id 2173450

# EQUIPMEN

EXHIBIT  Garrett  Name:  Date: 2171178C  ▲ Anthem Reporting, LLC

| COMPLETION DATE | START | FINISH | COMPL TECH - | INSTALLER/CONTRACTOR SIGNATURE | | COD |
|---|---|---|---|---|---|---|
| 07/26/14 | 330a | 4.30PM | 7373 | | CASH AMOUNT COLLECTED | 0.00 |
| | | | | | CHECK AMOUNT COLLECTED | |
| INSTALLATION TROUBLE SHOOTING RESOLUTION CODES | | | | INCOMPLETE CODE | TOTAL AMOUNT COLLECTED | |
| EF-1 | DD-1 | CY-2 | | | COMMENTS: | |

I (The Customer) UNDERSTAND THAT I AM RESPONSIBLE FOR ALL EQUIPMENT AND PAYMENT OF ALL APPLICABLE SERVICES AND PRODUCTS PROVIDED BY BRIGHT HOUSE NETWORKS. BY PROVIDING MY SIGNATURE BELOW, I UNDERSTAND AND ACKNOWLEDGE THAT AS A BRIGHT HOUSE NETWORKS CUSTOMER, I HAVE BEEN PROVIDED THE AGREEMENT FOR RESIDENTIAL SERVICES, THE ACCEPTABLE USE POLICY, AND THE PRIVACY NOTICE ("SUBSCRIBER POLICIES"), AND THAT I AGREE TO THE TERMS OF THE SUBSCRIBER POLICIES. IF I AM A HOME PHONE CUSTOMER, I EXPRESSLY ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND BHNS 911/E911 NOTICES AS SET FORTH IN THE SUBSCRIBER POLICIES.

CUSTOMER SIGNATURE

DRIVER'S LICENSE NUMBER  XG430-002-50-976-0   STATE

PHONE NUMBER

SOCIAL SECURITY NUMBER   GARRETT/CPA - 000023

WHITE-DBO
GREEN-DFO
CANARY-DO
PINK: CUSTOMER COPY

REV 4/2012

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ANGELA GARRETT,**

    **Plaintiff(s),**

**v.**                       **CASE NO.: 8:16-CV-2999**

**CREDIT PROTECTION
ASSOCIATION, L.P., and
ETAN GENERAL, INC.,**

    **Defendant(s).**

_____/

### AFFIDAVIT OF PLAINTIFF ANGELA GARRETT

    I, **ANGELA GARRETT**, being sworn, hereby certify that the following statements are true and correct:

1. I am over eighteen (18) years old and I am the Plaintiff in this action and thereby capable of making this affidavit. The facts stated in this affidavit are true and correct to the best of my personal knowledge.

2. In December 2014, I began receiving phone calls to my cellular telephone number 727-452-4687 from Credit Protection Association, L.P ("Defendants").

3. Defendants were calling to collect on an alleged debt from Bright House Networks.

4. I was in possession of my cellular telephone, cellular telephone number 727-452-4687, at the time of the calls in question in this case.

5. I answered one of Defendants' first few calls in December 2014 and demanded that they stop calling my cellular telephone number 727-452-4687.

    I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this Affidavit under penalty of perjury.

                                       _____
                                       Angela Garrett, Plaintiff

                                       11/7/16
                                       Date



EXHIBIT 3
Name: Garrett
Date: 2/7/17
Anthem Reporting, LLC


EXHIBIT 4
Name Garrett
Date 3/17/18
Anthem Reporting, LLC

**Customer Phone Number:   7274524687**

| Partner Name | Original Number | Event | Status | Call Duration | Event Date |
|---|---|---|---|---|---|
| | Unknown | Customer Registration | Registered | 0 | 07/15/2013 11:43:00 AM |
| | Unknown | Incoming Call | Blocked | 0 | 07/15/2013 12:18:13 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/15/2013 12:27:22 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/14/2013 12:29:23 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/15/2013 12:32:04 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/15/2013 12:38:43 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/17/2013 12:05:17 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/15/2013 12:25:35 PM |
| | Unknown | Incoming Call | Blocked | 0 | 07/16/2013 12:35:28 PM |
| | Unknown | Incoming Call | Device Switched | 0 | 10/11/2013 09:44:58 PM |
| | Unknown | Possible Mobile Device Change | Device Switched | | 11/06/2013 12:20:02 AM | Suspected Curfew Violation |
| | Unknown | Incoming Call | Blocked | 0 | 01/06/2014 05:33:26 PM |
| | Unknown | Incoming Call | Blocked | 0 | 02/26/2014 07:03:25 PM |
| | 78314 | Blocked a Number | Number Added to Block List | | 06/11/2014 12:28:05 PM | Additional call records not captured by PrivacyStar may exist on previous device. |
| | 7274894152 | Blocked a Number | Number Added to Block List | | 06/11/2014 12:28:05 PM | Suspected Curfew Violation |

| 800 SERVICE | | | | | |
| CELL PHONE CLEARWATER, FL | 8777533776 | Possible Mobile Device Change | Device Switched | 0 | 01/27/2014 03:18:07 PM |
| CELL PHONE CLEARWATER, FL | 7278912000 | Blocked a Number | Number Added to Block List | 0 | 04/02/2014 07:23:43 PM |
| CELL PHONE CLEARWATER, FL | 7278910880 | Blocked a Number | Number Added to Block List | 0 | 04/10/2015 02:48:09 PM |
| CELL PHONE CLEARWATER, FL | 7278910880 | Blocked a Number | Number Added to Block List | 0 | 04/10/2015 02:43:07 PM |
| CHOICE RECOVERY | 6143490000 | Blocked a Number | Number Added to Block List | 0 | 04/03/2013 12:11:54 PM |
| CHOICE RECOVERY | 6143490000 | Incoming Call | Blocked | 0 | 09/05/2013 02:56:39 PM |
| CHOICE RECOVERY | 6143490000 | Incoming Call | Blocked | 0 | 09/13/2013 03:03:58 PM |
| CHOICE RECOVERY | 6143490000 | Incoming Call | Blocked | 0 | 07/12/2013 03:44:22 PM |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Un-block | Un-blocked | | 08/16/2013 08:41:24 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/11/2014 02:05:30 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/11/2014 03:02:57 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/13/2014 01:40:36 AM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/12/2014 06:04:40 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/13/2014 08:54:52 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/15/2014 08:23:28 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/17/2014 08:59:26 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/18/2014 11:56:40 AM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/17/2014 10:28:44 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 12/18/2014 10:06:39 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8877019512 | Un-block | Un-blocked | 0 | 01/10/2015 04:05:59 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/14/2015 12:05:28 AM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/16/2015 11:11:25 AM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/16/2015 09:02:06 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/16/2015 03:22:25 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/17/2015 08:48:50 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/18/2015 07:35:27 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/20/2015 12:25:07 AM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/20/2015 09:04:52 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 8867432315 | Incoming Call | Blocked | 0 | 01/20/2015 08:15:54 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 4443356986 | Un-block | Number Removed from Block List | 0 | 02/09/2015 08:36:15 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356986 | Incoming Call | Blocked | 0 | 02/09/2015 11:42:43 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356986 | Incoming Call | Blocked | 0 | 02/13/2015 10:41:06 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 4443356986 | Incoming Call | Blocked | 0 | 02/13/2015 02:04:07 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356986 | Incoming Call | Blocked | 0 | 02/14/2015 07:12:19 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356986 | Incoming Call | Blocked | 0 | 02/16/2015 06:31:27 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 4443356956 | Incoming Call | Missed | 0 | 02/16/2015 03:32:24 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356956 | Incoming Call | Blocked | 0 | 02/20/2015 02:28:38 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356702 | Un-block | Number Removed from Block List | 0 | 02/24/2015 11:15:54 AM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356702 | Incoming Call | Blocked | 0 | 02/24/2015 11:33:23 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356702 | Incoming Call | Connected | 56 | 02/25/2015 06:44:01 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356702 | Incoming Call | Connected | 0 | 03/02/2015 07:15:04 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Un-block | Number Removed from Block List | 0 | 03/03/2015 07:48:31 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Connected | 0 | 03/05/2015 06:48:44 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Blocked | 0 | 03/05/2015 05:09:06 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Missed | 0 | 03/10/2015 02:43:21 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Missed | 0 | 03/11/2015 02:42:11 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Added to Block List | 0 | 03/10/2015 08:52:45 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Blocked | 0 | 03/12/2015 08:42:27 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Missed | 0 | 03/15/2015 04:17:53 PM | Active Offender | Suspected Curfew Violation |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Connected | 0 | 03/16/2015 09:03:22 PM | Active Offender |
| CREDIT PROTECTION ASSOCIATION | 4443356701 | Incoming Call | Blocked | 0 | 03/17/2015 07:24:37 AM | Active Offender | Suspected Curfew Violation |



| Caller | Number | Date/Time | Type | Action | Flag | Note |
|---|---|---|---|---|---|---|
| SCAMMER | 6406031205 | 02/26/2015 07:20:29 PM | Incoming Call | Blocked | | Suspected Outlaw Violation |
| SCAMMER | 6406031205 | 04/01/2015 11:47:43 PM | Incoming Call | Blocked | | Active Offender |
| STEPHENS & MICHAELS | 6667896412 | 02/26/2013 05:46:02 PM | Blocked a Number | Number Added to Block List | | Active Offender \| Suspected Outlaw Violation |
| STEPHENS & MICHAELS | 8857896912 | 02/26/2013 01:11:05 AM | Incoming Call | Blocked | | Active Offender |
| STEPHENS & MICHAELS | 8897896412 | 02/16/2013 05:01:14 PM | Incoming Call | Blocked | | Active Offender |
| STEPHENS & MICHAELS | 8857896012 | 02/11/2013 07:17:24 PM | Incoming Call | Blocked | | |
| UNKNOWN | 8181919915 | 01/24/2013 09:14:38 PM | Blocked a Number | Number Added to Stock List | ○ | |
| UNKNOWN | 8181919915 | 01/24/2013 08:17:24 PM | Completed Filed | Filed Complaint Against Number \| No Consent Given | ○ | |
| UNKNOWN | 6263743535 | 01/25/2013 08:52:22 PM | Blocked a Number | Number Added to Stock List | ○ | |
| UNKNOWN | 4263715355 | 01/25/2013 08:52:45 PM | Completed Filed | Filed Complaint Against Number \| No Consent Given | ○ | |
| UNKNOWN | 2545031072 | 01/25/2013 08:53:44 PM | Un-block | Number Removed from Block List | ○ | |
| UNKNOWN | 6184623633 | 04/28/2013 10:33:41 PM | Blocked a Number | Number Added to Block List | | |
| UNKNOWN | 2545033072 | 11/09/2013 09:57:25 PM | Incoming Call | Blocked | ○ | Suspected Outlaw Violation |
| UNKNOWN | 2545032072 | 11/05/2013 11:01:50 PM | Incoming Call | Blocked | ○ | |
| UNKNOWN CA CALLER | 3109695695 | 04/16/2014 06:22:52 PM | Blocked a Number | Number Added to Block List | | |
| UNKNOWN CA CALLER | 8185462723 | 01/04/2013 01:10:07 PM | Blocked a Number | Number Added to Block List | | |
| UNKNOWN CA CALLER | 8185462723 | 01/04/2013 01:03:05 PM | Completed Filed | Filed Complaint Against Number \| No Consent Given | | |
| UNKNOWN CA CALLER | 8185462723 | 01/04/2013 04:42:53 PM | Complaint Filed | Filed Complaint Against Number \| No Consent Given | | |
| UNKNOWN CA CALLER | 2132455875 | 01/29/2013 04:41:09 PM | Blocked a Number | Number Added to Stock List | | |
| UNKNOWN CA CALLER | 2132455875 | 01/29/2013 04:41:55 PM | Completed Filed | Filed Complaint Against Number \| No Consent Given | ○ | Suspected Outlaw Violation |
| UNKNOWN FL CALLER | 8182452723 | 01/01/2013 11:43:46 PM | Incoming Call | Blocked | | |
| UNKNOWN FL CALLER | 7267444097 | 02/11/2014 08:51:29 PM | Blocked a Number | Number Added to Stock List | | |
| WAI WAI CREDIT CORPORATION | 3804514697 | 12/02/2015 04:04:22 PM | Blocked a Number | Number Added to Block List | ○ | Active Offender |
| WALGREENS PHARMACY | 6770215723 | 02/07/2014 08:40:29 PM | Blocked a Number | Number Added to Block List | | |
| WALGREENS PHARMACY | 6770215723 | 09/15/2015 10:01:55 PM | Incoming Call | Blocked | ○ | Suspected Outlaw Violation |
| WALGREENS PHARMACY | 6770215723 | 09/18/2015 01:33:23 PM | Incoming Call | Blocked | ○ | |

**DOCUMENTS RESPONSIVE TO FAST TRACK SCHEDULING ORDER**
**REQUEST ¶ A (2), (3), and (5)**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ANGELA GARRETT,

     Plaintiff,

v.                         Case No.: 8:16-cv-2999-T-33AAS

CREDIT PROTECTION
ASSOCIATION, LP, AND
ETAN GENERAL, INC.,

     Defendants.
_____/

## PLAINTIFF'S VERIFIED RESPONSES TO THE
## COURT'S INTERROGATORIES TO PLAINTIFF

     **COMES NOW**, Plaintiff, **ANGELA GARRETT** ("Ms. Garrett"), by and through the

undersigned counsel, and hereby submits her responses to the Court's Interrogatories to Plaintiff

as included in the Scheduling Order (Doc. No. 4) as follows:

    (1) What kind of communications are at issue in this case? Telephone calls placed to a land

       line, or to a cellular phone? Letters mailed to a residence? Facsimile transmissions?

       Please be as specific as possible.

       **RESPONSE:** Credit Protection Association, L.P. ("Defendant")'s telephone calls placed

       to Ms. Garrett's cellular phone number 727-452-4687 are at issue in this case.

    (2) How many calls, letters, or other communications are at issue? For instance, if you allege

       telephone calls were placed in violation of the TCPA, how many calls were placed?

       **RESPONSE:** Defendant placed sixty-six (66) telephone calls to Ms. Garrett's cellular

       phone number 727-452-4687 after Ms. Garrett demanded that Defendant stop calling her

       cellular phone.



(3) When did the communications at issue take place?

**RESPONSE:** Defendant's calls took place from December of 2014 to March of 2015.

(4) If telephone calls are at issue, do you allege that Defendant used an automatic dialer?

**RESPONSE:** Yes. Sometimes Ms. Garrett would receive a call, would answer, and have to hold for a representative to come onto the line to speak with her.

(5) If telephone calls are at issue, do you allege that Defendant utilized a live person or a recorded voice to transmit the relevant information?

**RESPONSE:** Defendant used a live person to transmit the information in the calls Ms. Garrett received.

(6) If telephone calls are at issue, do you allege that the calls were placed to a telephone that is registered in your name? If not, to whom is the account registered?

**RESPONSE:** Yes, Defendant's calls were placed to a cellular telephone that is registered in Ms. Garrett's name.

(7) Do you have a prior business relationship with Defendant?

**RESPONSE:** No.

(8) Did you sign any document in which you consented to be contacted by Defendant?

**RESPONSE:** No.

(9) Do you intend to pursue a class action?

**RESPONSE:** No.

Case 8:16-cv-02999-VMC-AAS Document 49-1 Filed 07/10/17 Page 85 of 86 PageID 493

Case 8:16-cv-02999-VMC-AAS Document 27 Filed 12/07/16 Page 3 of 4 PageID 122
Case 8:16-cv-02999-VMC-AAS Document 4 Filed 10/25/16 Page 12 of 16 PageID 57

_____
(Plaintiff's Signature)

STATE OF FLORIDA
COUNTY OF Pinellas

BEFORE ME, the undersigned authority, on this day,
personally appeared Angela B GARRETT _____, who
being first duly sworn, and ____ who is personally known to
me or ____ who produced FL DL as identification, C630.002.80.918.0
deposes and says that he/she has read the foregoing Answers
to Interrogatories, knows the contents of same, and to the
best of his/her knowledge and belief, the same are true and
correct.

SWORN TO AND SUBSCRIBED before me on this 5th day
of December 20 16.

NOTARY PUBLIC

_____
Signature of Person Taking Acknowledgment

Notary Stamp

Print Name: LYNN DELFINO
Title: Notary Public
Serial No. (if any): FF 996413
Commission Expires: MAy 26, 2020



LYNN DIANNE DELFINO
MY COMMISSION # FF996413
EXPIRES May 26, 2020
(407) 398-0153   FloridaNotaryService.com

12

Respectfully submitted on this 06 day of **December, 2016,**

/s/ *Michael A. Ziegler*
Michael A. Ziegler, Esq.
FBN: 74864
Law Office of Michael A. Ziegler, P.L.
13575 58th Street North, Suite 129
Clearwater, FL 33760
(p) (727) 538-4188
(f) (727) 362-4778
mike@zieglerlawoffice.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this **06** day of **December, 2016,** I electronically served and filed the foregoing to the following counsel for Defendants: Andrew J.J. Collinson, Esq., Hinshaw & Culbertson, LLP, 100 S. Ashley Dr., Ste. 500, Tampa, FL 33602, acollinson@hinshawlaw.com; and Ruel W. Smith, Esq., Hinshaw & Culbertson, LLP, 100 S. Ashley Dr., Ste. 500, Tampa, FL 33602, rsmith@hinshawlaw.com.

Respectfully submitted,

/s/ *Michael A. Ziegler*
Michael A. Ziegler, Esq.
FBN: 74864
Law Office of Michael A. Ziegler, P.L.
13575 58th Street North, Suite 129
Clearwater, FL 33760
(p) (727) 538-4188
(f) (727) 362-4778
mike@zieglerlawoffice.com
Attorney for Plaintiff